COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| | § | No. 08-10-00361-CV |
| IN THE MATTER OF THE ESTATE | § | |
| OF NOEMI RUTH SIDRANSKY A/K/A | | Appeal from |
| NOEMI WIENER SIDRANSKY, | § | |
| DECEASED. | | Probate Court No. 2 |
| | § | |
| | | of El Paso County, Texas |
| | § | |
| | | (TC # 2007-P00977) |
| | § | |

## O P I N I O N

This is a will contest which Appellee Graciela Barajas characterizes as an opportunity to ensure that a mother's dying wish is recognized in life. Noemi Sidransky was born in 1928 and married at the age of sixteen. She bore twelve children during the marriage, one of whom is disabled. This daughter, Miriam, suffers from a mental disability which requires specialized care and attention. In 1993, Sidransky's husband passed away. Sidransky cared for Miriam by herself but sometime thereafter, another daughter--Graciela Barajas--became the primary caretaker for both Miriam and Sidransky. Sidransky died on August 25, 2007 at seventy-nine years of age. She left a trust and will executed in 1999 and amended in 2003, both of which named Graciela as executor of her estate. The record reveals that Sidransky expressed to her attorney that she wished to provide at least 50 percent of her estate to Miriam through the trust. The testimony of the attorney, David Grady, is critical to our review.

In December 1999, Sidransky, Graciela, and Miriam headed to Albuquerque for a medical appointment. Graciela arranged for Sidransky to meet with David Grady, a New Mexico attorney experienced in estate planning and elder care. Grady met the family at their

hotel and asked to speak with Sidransky alone. They pair talked for over an hour. There apparently was a second consultation at Grady's law office. In his deposition, Grady offered his opinion as to Sidransky's state of mind:

> Q: During that exchange of information when you were being deluged with information, did you have any impression as to whether there was being any pressure exerted by Mrs. Barajas in terms of the content and the nature of the will or the trust that you were to prepare?
>
> A: I was satisfied that there was not.
>
> Q: That there was not any undue influence or pressure?
>
> A: I was satisfied that there was not.

Grady also offered the following opinions. Sidransky was making her own decisions and seemed strong willed. She understood the purpose of the meeting, she knew about her property, and she recognized who her children were. Her primary goal was to ensure that Miriam was protected since she could not care for herself. She wanted half of her estate and her life insurance benefits bequeathed to Miriam. Sidransky preferred that Graciela handle the estate because Sidransky knew Graciela would take care of Miriam. Overall, Miriam was to receive 50 percent, Graciela would receive 20 percent, another daughter--Judith Jamui--and her children were to receive 26 percent.

Sidransky also expressly excluded certain children from the will. She told Grady that she believed some of the children had stolen property after her husband passed away. She explained that there were "two camps," one of which took property she believed was hers. The other camp was supportive of her. The will and trust both specified that Sidransky intentionally omitted Eduardo Sidransky, Esther Ovadia, Saul Agustin Sidransky, Jose Moises Sidransky, and Raquel Unell as beneficiaries and referred to them as "disfavored children." Moises and Raquel are the Appellants herein. The 1999 will and trust were executed before two impartial witnesses, both

of whom signed an affidavit that Sidransky signed of her own free will and without undue influence.

Just a few weeks after she signed the will, Sidransky underwent heart surgery in Albuquerque. Moises and Raquel visited her, engaged a notary public at the hospital, and obtained a signed power of attorney appointing Moises as Sidransky's attorney in fact. Three days later, Sidransky asked Grady to revoke the power of attorney and to draw papers appointing Graciela as her attorney in fact.

In February 2001, Raquel sought a temporary guardianship for her mother. In response, Sidransky sought a protective order against Raquel and Moises. Following an independent psychiatric evaluation that determined Sidransky to be of sound mind and capable of making her own decisions, the trial court declined to establish a guardianship.

In 2003, Sidransky met with Grady again. She had traveled to New York and learned that her safety deposit boxes had been emptied. She believed that another daughter--Sarah Meier--had stolen the contents. Sarah had been appointed first successor to Graciela in the power of attorney. Sidransky asked Grady to prepare a new power of attorney appointing Graciela as attorney in fact, with Judith named as first successor. She also told Grady she wanted to redo her will to exclude additional children. Moises and Raquel were specifically omitted. Grady drafted the paperwork and explained the contents. He testified that although his client was weaker, there had been no change in mental functioning since he first met her in 1999. The 2003 will was executed before a disinterested witness. He, too, signed an affidavit that Sidransky was of sound mind and had not been subjected to undue influence.

As we have noted, Sidransky died on August 25, 2007. On October 4, Moises instituted a proceeding to declare heirship of Sidransky's estate and for an independent administration.

Graciela then filed a counter-petition to probate the 2003 will. Moises and Raquel opposed the application to probate the will claiming that Sidransky lacked testamentary capacity and was unduly influenced by Graciela. On March 14 and 15, 2009, Probate Court Number Two conducted a bench trial to address only the issue of testamentary capacity. Thereafter, the court found Sidransky had the requisite mental capacity to execute both the 1999 and the 2003 instruments. Graciela then moved for summary judgment on Appellants' undue influence claim. The trial court granted the motion and this appeal follows.

## STANDARD OF REVIEW

Graciela filed a hybrid motion for summary judgment that combined a traditional motion under Texas Rule of Civil Procedure 166a(c) with a no-evidence motion under Rule l66a(i). The purpose of summary judgment is to eliminate patently unmeritorious claims and untenable defenses. Accordingly, the movant has the burden of proving that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Nixon v. Mr. Property Management Co., Inc.*, 690 S.W.2d 546, 548-49 (Tex. 1985). In determining whether the movant has carried this burden, all evidence favorable to the non-movant must be taken as true, every reasonable inference must be indulged in favor of the non-movant, and any doubts must be resolved in the non-movant's favor. *Nixon*, 690 S.W.2d at 548-49.

Traditional summary judgments must stand on their own merits. *M.D. Anderson Hospital and Tumor Institute v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000). Unless the summary judgment proof conclusively establishes the movant's cause of action or defense, the non-movant is not required to respond to the motion at all. *Id*.; *Rhone-Poulenc v. Steel*, 997 S.W.2d 217, 222-23 (Tex. 1999). Even in the absence of any response to the motion, the non-movant may contend on appeal that the movant's proof was insufficient to support the entry of summary

judgment. *M.D. Anderson*, 28 S.W.3d at 23.

In reviewing a no-evidence summary judgment, the court must consider the evidence in the light most favorable to the non-movant. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750-51 (Tex. 2003). A no-evidence summary judgment is essentially a pretrial directed verdict, and the court applies the same legal sufficiency standard in reviewing a no-evidence summary judgment as applies in reviewing a directed verdict. *Id.*

Accordingly, the court reviews the evidence in the light most favorable to the non-movant, disregarding all contrary evidence and inferences. *Id.* A no evidence point will be sustained when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *Id.* Thus, a no-evidence summary judgment is improperly granted if the non-movant brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact. *Id.*, *citing* Tex.R.Civ.P. 166a(i). "Less than a scintilla of evidence exists when the evidence is so weak as to do no more than create a mere surmise or suspicion of a fact." [Internal quotations omitted]. *King Ranch*, 118 S.W.3d at 751. By contrast, "[m]ore than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." [Internal quotations omitted]. *Id.*, *citing Merrell Dow Pharms. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997).

## UNDUE INFLUENCE

In part, Graciela moved for summary judgment on the ground that there is no evidence

that Sidransky's will was executed as a result of undue influence.[1]  To set aside a will because of

undue influence, the contestant must prove the following three elements:

> (1) the existence and exertion of an influence;

> (2) the effective operation of that influence so as to subvert or overpower the testator's mind at the time of the execution of the testament; and

> (3) the execution of a testament which the maker would not have executed but for such influence.

*Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963).  Accordingly, the party claiming undue

influence must introduce some tangible and satisfactory proof of the existence of each of these

elements.  *Scott v. Townsend*, 106 Tex. 322, 166 S.W. 1138 (Tex. 1914).  Evidence concerning

one element is insufficient because each element is necessary to establish a claim of undue

influence.  *See Rothermel*, 369 S.W.2d at 923.

Not every influence exerted on a person is undue.  *Id*.  In fact, an influence is not "undue"

unless it destroys the free agency of the testatrix and the will produced expresses the wishes of

the one exerting the influence.  *Id*.  "One may request, importune, or entreat another to create a

favorable dispositive instrument, but unless the importunities or entreaties are shown to be so

excessive as to subvert the will of the maker, they will not taint the validity of the instrument."

*Guthrie v. Suiter*, 934 S.W.2d 820, 831 (Tex.App.--Houston [1st. Dist.] 1996, no writ), *citing*

*Rothermel*, 369 S.W.2d at 922.

Establishing the existence of undue influence generally involves inquiry into factors such

as:

> 1.  the circumstances surrounding execution of the instrument;

---

[1]  Graciela moved for summary judgment on both traditional and no evidence grounds.  The trial court granted the motion without specifying which grounds he relied upon in making the decision.  Because our analysis under no evidence grounds is dispositive of the issues, we need not address Appellants' complaint to the extent it relates to Graciela's traditional motion for summary judgment.

2. the relationship between the testator and the beneficiary and any others who might be expected recipients of the testator's bounty;

3. the motive, character, and conduct of the persons benefitted by the instrument;

4. the participation by the beneficiary in the preparation or execution of the instrument;

5. the words and acts of the parties;

6. the interest in and opportunity for the exercise of undue influence;

7. the physical and mental condition of the testator at the time of the will's execution, including the extent to which she was dependent upon and subject to the control of the beneficiary; and

8. the improvidence of the transaction by reason of unjust, unreasonable, or unnatural disposition of the property.

*See Guthrie*, 934 S.W.2d at 832, *citing Mackie v. McKenzie*, 900 S.W.2d 445, 449 (Tex.App.--Texarkana 1995, writ denied). We review these factors in light of the summary judgment evidence produced to determine whether the contestant raised a question of fact.

A contestant may prove undue influence by circumstantial evidence, but it must be probative of the issue and not merely create a surmise or suspicion that such influence existed at the time the will was executed. *Reynolds v. Park*, 485 S.W.2d 807, 813 (Tex.Civ.App.--Amarillo 1972, writ ref'd n.r.e.). The exertion of undue influence cannot be inferred by opportunity alone. *Cotten v. Cotten*, 169 S.W.3d 824, 827 (Tex.App.--Dallas 2005, pet. denied). Instead, "[t]here must be some evidence to show that the influence was not only present, but [that it was] in fact exerted with respect to the making of the testament itself." *Id.* A fact issue is raised by circumstantial evidence if, from the evidence, a reasonable person would conclude that the existence of the facts is more reasonable than its nonexistence. *Smith v. Tennessee Life Ins. Co.*, 618 S.W.2d 829, 834 (Tex.Civ.App.--Houston [1st Dist.] 1981, no writ). All that is required is that the circumstances point to ultimate facts sought to be established with such a degree of

certainty as to make the conclusion reasonably probable. *Id*. For the evidence to be sufficient to raise a fact question on undue influence, it must be more than purely speculative. *Kirkpatrick v. Raggio*, 319 S.W.2d 362, 366 (Tex.Civ.App.--Fort Worth 1958, writ ref'd n.r.e.). No fact issue is raised where the evidence is so indefinite and uncertain as to preclude a finding. *Id*.

### *Existence and Exertion of Influence*

First, we must determine whether Appellants presented sufficient evidence to create a fact issue as to the existence and exertion of an influence. Initially, Appellants focus on Sidransky's medical problems during the late 1990's and up until her death to support their challenges to the December 1999 and May 2003 wills and trusts. They rely in part on an affidavit from Dr. Cynthia Rivera which states:

> 4. My forensic review of Mrs. Noemi Ruth Sidransky a/k/a/ Noemi Wiener Sidransky's medical records from the period of 1997 to 2007 determined that Ms. Sidransky was under undue influence when she signed legal documents such as her Will and Trust, on or about December 15, 1999 and that she was under undue influence when she amended her Trust and Will, on or about May 15, 2003.

In reading the entirety of Dr. Rivera's affidavit, it appears her true conclusion was merely that Sidransky was "susceptible to undue influence" during the relevant times. For instance, in paragraph seven, Dr. Rivera states:

> 7. The progress notes circa 1998 to early 2000 identify significant disorders that promoted further progression of her memory loss including, atrial fibrillation, multiple cerebrovascular accidents, transient ischemic attacks, diabetes (small vessel disease), malignant hypertension, atherosclerotic heart disease, and a new onset seizure disorder. Observations made by physicians include documented memory loss, left-sided arm and leg weakness (hemiparesis), slurred speech, slow speech (bradydysphasia) and slowed movements (bradykinesia). The progress notes indicate that conversations were held *with the daughter* and not Mrs. Sidransky. In February 1999, Mrs. Sidransky had a four-vessel coronary artery bypass graft. Post surgery, she had a seizure-like episode and periods of hypotensive episodes. Her blood sugar was difficult to regulate. **With the already documented memory loss, difficulty with speech, weakness of the left side of her body, exacerbation of seizures, and diabetes, it is more likely than not that Mrs. Sidransky was susceptible to undue influence from her**

**primary care provider, and said undue influence may be manifested in the Will and Trust she executed in December of 1999.**

[Emphasis in original]. And in paragraphs eight through twelve, Dr. Rivera opines:

8. With regards to signing the amendment to the Trust and the Will on or about May 15, 2003, the information used to form an opinion included medical records from the above time period from Las Palmas Medical Center, Providence Memorial Hospital, Sierra Medical Center, Dr. Michael Traylor, Dr. Dionicio Manuel Alvarez, Dr. Mary Ward and Dr. Luis D. Acosta-Corrales.

9. On November 14, 2002, notes written by Dr. Acosta-Corrales indicate that Mrs. Sidransky was having periods of confusion, asking for her already deceased mother and getting extremely upset because 'they would not let me see her.' She was delusional and having periods of hallucinations. She had been having unstable glycemias, sometimes related to her abnormal mental activity with extreme increases in her blood sugars. At that time, she was extremely stubborn and irritable. She suffered from insomnia and nocturnal hyperactivity (sundowning). She had very unstable blood pressures. She was placed on Seroquel 25mg nightly (an atypical anti-psychotic) and diagnosed with Multi-infarct dementia with psychotic features.

10. She was seen by Dr. Alvarez on March 27, 2003. Her daughter, Graciela Barajas, had complaints that her mother was more forgetful. He notes that she was fine and not confused. He determines that she has Pre-Alzheimer's and starts her on Aricept (for Alzheimer's dementia).

11. She was seen again on June 3, 2003 by Dr. Acosta-Corrales. She is confused and agitated, off and on. The Seroquel was discontinued due to cognitive problems (as written above). 'She suffers from increasing seizures due to Atrial fibrillation and recurrent strokes. Mrs. Sidransky is demented with very poor recent memory, very poor judgment and insight. Her higher cortical functions are all below level. **She is unable to provide historical data with certainty or to engage in a coherent conversation without asking for the help of her daughter, Graciela.**'

12. Given the assessment by the neurologist in November 2002 and June 3, 2003 and the longstanding progressive nature of her illness, it appears that **Mrs. Sidransky was susceptible to undue influence exerted by her daughter, Graciela Brajas [sic] during the time that she amended her Will and Trust, May 15, 2003.**

[Emphasis in original]. Even in light of Dr. Rivera's affidavit, Sidransky's weakened physical and mental condition only indicates her *susceptibility* to influence; it is no evidence that such

influence *existed* in fact. *See Guthrie*, 934 S.W.2d at 824, *citing Reynolds v. Park*, 485 S.W.2d 807, 813 (Tex.Civ.App.--Amarillo 1972, writ ref'd n.r.e.).

### *Overpowering Sidransky's Mind At Execution*

We must also assess whether Appellants established that an improper influence overpowered Sidransky's mind at the time she executed the instruments. Appellants again focus on Sidransky's medical condition and contend that she was in a weakened mental and physical state at the time she executed the wills and trusts. Such evidence is only indicative of Sidransky's susceptibility to influence; it does not establish that her mind was in fact subverted or overpowered at the time of the execution of the wills or trusts. *See Guthrie*, 934 S.W.2d at 832 ("A testatrix's weakened physical and mental condition is only indicative of her susceptibility to influence; it is no evidence that such influence exists in fact.").

Appellants also contend that Graciela was always in close contact with Sidransky and that she was a dominant daughter who managed all of Sidransky's money and paid her bills. They argue that Graciela attempted to isolate Sidransky from several of her children, including Appellants. Once again these facts only illustrate that Graciela had the opportunity to unduly influence Sidransky; they are not proof that Graciela actually exerted influence over her. *See Estate of Davis v. Cook*, 9 S.W.3d 288, 293 (Tex.App.--San Antonio 1999, no pet.)(determining contacts with testatrix, who was 98 years old at the time, lonely, isolated, and plagued with physical infirmities, merely created an opportunity to exert improper influence over testatrix); *Guthrie*, 934 S.W.2d at 832 (concluding close relationship between testatrix and executor created opportunity for executor to unduly influence testatrix).

Finally, Appellants claim that Graciela was actively involved in the planning, preparation, and execution of Sidransky's will. Graciela arranged for Sidransky to meet with

Grady in New Mexico. We have detailed Grady's contact with Sidransky and his opinions of her mental health spanning the years between 1999 and 2003. It is clear that Grady met with his client in private for considerable periods of time. He found Sidransky to be clear headed and strong willed with no indication that she was unduly influenced by Graciela. Independent witnesses at execution verified Grady's description.

### *Execution Would Not Have Happened But For Such Influence*

Lastly, we must assess whether Appellants established a genuine issue of material fact as to whether there was an execution of a document which Sidransky would not have executed "but for" the alleged influence. Establishment of this element is generally predicated upon an assessment of whether the testament provides for an unnatural disposition of the property. *See Estate of Davis*, 9 S.W.3d at 294. In this respect, only where all reasonable explanation for the devise is lacking may the trier of facts consider the disposition as evidence of disorder or lapsed mentality. *Id*.

Appellants contend that Sidransky's decision to exclude certain children is unnatural and some evidence of undue influence. The fact that a testatrix chooses to distribute her estate among a number of children or relatives making one bequest larger than another, or the fact that a testatrix chooses to exclude certain children from a will while providing for others is not in and of itself evidence of undue influence. A person of sound mind has the right to dispose of his or her property in the manner he or she wishes. *Rothermel v. Duncan*, 369 S.W.2d 917, 923 (Tex. 1963).

Sidransky clearly believed that certain children were stealing from her. That may or may not be true. She described the "two camps" and advised Grady that one camp was loyal to her and the other was not. She specified her "disfavored children" and told Grady to omit them from

the will and trust. Witnesses from the execution of the 1999 will and the witness of the execution of the 2003 will verified Sidransky was of sound mind and under no constraint of undue influence. Because none of the summary judgment evidence raises a genuine issue of material fact on the existence and exertion of influence by Graciela, the trial court properly granted Graciela's motion for summary judgment. Finding no error, we affirm the judgment of the court below. May she rest in peace.

August 15, 2012

_____
ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rivera, and Antcliff, JJ.